IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIS RANDOLPH,

    Petitioner,                    No. CIV F-93-5604 LJO JFM P

    vs.

GEORGE SMITH, et al.,              <u>ORDER AND</u>

    Respondents.            <u>FINDINGS AND RECOMMENDATIONS</u>

                               /

          Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his December 1989 conviction on charges of first degree murder with use of a firearm, for which he is serving a sentence, imposed on February 21, 1990, of twenty-seven years to life in prison. On September 11, 2002, this court issued findings and recommendations recommending that the petition be denied. Petitioner filed objections to the findings and recommendations, and respondents filed a reply to petitioner's objections. On May 30, 2003, the district court adopted this court's recommendation and denied the petition. Judgment was entered on the same day.

          Petitioner appealed the judgment. On August 19, 2004, the United States Court of Appeals for the Ninth Circuit (hereafter "court of appeals") affirmed in part and vacated in part the order of the district court. The court of appeals remanded the matter for further factual

1

findings on petitioner's claim that incriminating statements he made to a jailhouse informant named Ronnie Moore were obtained in violation of his Sixth Amendment rights under Massiah v. United States, 377 U.S. 201 (1964).  See Randolph v. People of the State of Cal., 380 F.3d 1133, 1138 (9th Cir. 2004).  The court of appeals also declined to resolve a part of petitioner's claim under Brady v. Maryland, 378 U.S. 83 (1963) that it found depended on the same factual findings required for the Massiah claim.  Id.

By order filed November 30, 2004, the district court referred the matter back to the undersigned for an evidentiary hearing.  See Order filed November 30, 2004.  After a period of discovery, an evidentiary hearing was conducted in this court on March 30 and 31, 2006 and April 3, 2006.  At that time, this court heard testimony from seven witnesses, and several exhibits were admitted into evidence.  Thereafter, the matter was submitted.

FACTS[1]

> Petitioner Randolph is currently serving a life sentence for his conviction for the murder of 10-year-old Lamont Collins on June 24, 1981.
>
> . . . .
>
> [Petitioner's] first trial ended in a mistrial when the jury hung. Subsequent interviews revealed that eight of the jurors had voted to find Randolph guilty and four had voted to acquit.
>
> . . . . On retrial the prosecutor had the benefit of two additional witnesses, both of whom were jailhouse informants.  One informant was Jack Konkle, who gave somewhat conflicting and relatively insignificant testimony. The other was Ronnie Moore, who provided crucial testimony against Randolph.
>
> Moore shared a jail cell with Randolph throughout most of Randolph's first trial and for several weeks after the judge declared a mistrial.  Moore came to the attention of prosecutors when he gave them a letter asking for leniency and mentioning that he was Randolph's cellmate.  Moore's defense attorney, as well as prosecutors, interpreted Moore's letter as an offer to testify against Randolph. Moore met with Deputy District Attorney James Oppliger and Detective Pete Chavez several times to discuss his

---

[1] The facts relevant to the issues on remand are taken from the court of appeals opinion.

        possible testimony against Randolph, as well as a plea deal relating to the crime for which Moore was being held.  At some point, Moore told Oppliger and Chavez that Randolph had admitted to killing Lamont and had said that he was due to receive a lot of money.  Moore also told the prosecution team that Randolph had known Lamont's father and had spoken highly of him, thus supporting the prosecution's theory that the father had hired Randolph to kill Lamont.

        Prior to the start of the second trial, Randolph moved to exclude the testimony of Konkle and Moore.  After hearing the proffered testimony of the two witnesses, the trial judge denied the motion.  With the benefit of these additional witnesses, the State obtained a conviction for first degree murder.  Randolph was sentenced to a prison term of 27 years to life.

(Randolph v. People of the State of Cal., 380 F.3d at 1138-39.)

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

        Federal habeas corpus relief under 28 U.S.C. § 2254 is available only for a violation of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also, Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).

        This action was filed before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA).  Accordingly, review of petitioner's claims is governed by pre-AEDPA standards of review.  See Slack v. McDaniel, 529 U.S. 473, 481-82 (2000); see also Lindh v. Murphy, 521 U.S. 320, 326 (1997).

        Under those standards, state court findings of historical fact are presumed correct and deferred to by the federal court "'in the absence of "convincing evidence" to the contrary' or a demonstrated lack of 'fair support in the record.'"  Mayfield v. Woodford, 270 F.3d 915, 922 (9th Cir. 2001) (citing 28 U.S.C. S 2254(d) (1994); and quoting Marshall v. Lonberger, 459 U.S. 422, 432 (1983)).  Mixed questions of law and fact and pure questions of law are reviewed de

novo. (Id. (citations omitted))  Petitioner has the burden of establishing "'by a preponderance of evidence'" the facts underlying his constitutional claim. McKenzie v. McCormick, 27 F.3d 1415, 1418-19 (9th Cir. 1994) (quoting Johnson v. Zerbst, 304 U.S. 458, 469 (1938)). "'[T]he preponderance of the evidence standard is a meaningful one that requires the judge to be convinced by a preponderance of the evidence that the fact in question exists.'" U.S. v. Jordan, 256 F.3d 922, 930 (9th Cir. 2001) (quoting U.S. v. Mezas de Jesus, 217 F.3d 638, 643 (9th Cir. 2000).

II. Petitioner's Claims

    A.  Petitioner's Massiah Claim as to Ronnie Moore

In petitioner's sixth claim for relief[2] he contends that he was denied his Sixth Amendment right to counsel by the state's deliberate elicitation of petitioner's admissions to jailhouse informant Ronnie Moore after petitioner had been arraigned and appointed counsel. See Massiah v. United States, 377 U.S. 201 (1964). The court of appeals' order sets forth the showing that petitioner must make to prevail on this claim:

> . . . . [T]o show that the state violated his Sixth Amendment rights by obtaining and using Moore's testimony, Randolph must show that Moore was acting as an agent of the State when he obtained the information from Randolph and that Moore made some effort to "stimulate conversations about the crime charged." See id. Notably, "stimulation" of conversation falls far short of "interrogation." See Fellers v. United States, 540 U.S. 519, ---- -----, 124 S.Ct. 1019, 1022-23, 157 L.Ed.2d 1016 (2004) (finding that "implicit questions" and "discussion" about defendant's methamphetamine use constituted a Sixth Amendment violation) (internal quotation marks and brackets removed). Any statements, however, made by Randolph before Moore met with the prosecution team cannot be the basis of a *Massiah* violation. See Maine v. Moulton, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ( "[T]he Sixth Amendment is not violated whenever-by luck or happenstance-the State obtains incriminating statements from the accused after the right to counsel has attached.")

Randolph, at 1144.

---

[2] Petitioner raised eleven claims in his third amended petition, three of which he specifically abandoned. Petitioner's claims are identified by the number ascribed in the third amended petition. See Findings and Recommendations filed September 11, 2002, at 5 n.2.

4

The court of appeals found that "Moore was acting as an agent of the State when he was placed in Randolph's cell after meeting with Deputy District Attorney Oppliger and Detective Chavez." Id. It further found that two factual issues "critical" to resolution of the Massiah claim remained unresolved, as follows:

> The first issue relates to timing: When did Moore meet with the prosecution team, and when, in relation to that meeting or those meetings, did Moore obtain incriminating information from Randolph? The second issue relates to Moore's behavior: What, if anything, did Moore do to stimulate conversations with Randolph about the crime with which Randolph was charged.

Id. at 1144-45.[3] The court turns first to the timing question.[4]

---

[3] In its opinion, the court of appeals elaborated on testimony from the November 2000 evidentiary hearing with respect to the timing issue, as follows:

> According to Moore, he had two early meetings with Oppliger and Chavez, and the first of those two meetings took place before he obtained incriminating information from Randolph. According to Oppliger and Chavez, there was only one early meeting, and that meeting took place after Moore had obtained the incriminating information.
>
> Moore testified before the magistrate judge that he first met with Deputy Oppliger and Chavez on August 17, 1989, the day he gave his letter requesting leniency to his defense attorney. Moore further testified that it was only after he was placed back in the jail cell, after that meeting, that Randolph made many of the incriminating statements to which Moore later testified at Randolph's trial. Moore testified that he relayed those statements to prosecutors at a second meeting on August 24. Oppliger and Chavez, however, testified that there was only one early meeting. According to their testimony, that meeting took place on August 24.
>
> . . . .
>
> Moore testified consistently and repeatedly that he met with Oppliger and Chavez on both August 17 and 24. Moore testified that at the first meeting on August 17 he had little to offer Oppliger and Chavez in the way of incriminating statements and that he only told them of Randolph's incriminating statements at the second meeting. Moore also testified that Randolph did not make incriminating statements until after the trial judge declared a mistrial in the first trial. According to Moore, the mistrial was

5

Starting on July 6, 1989, petitioner and Ronnie Moore were housed together in a cell in the Fresno County Jail. Moore was in jail pending disposition of vehicle theft charges. Petitioner was on trial on the charges at bar.[5] On August 11, 1989, the jury in petitioner's trial reported to the court that they were "deadlocked and [could] not reach a verdict." (Petitioner's Ex. 27.) The judge sent them back with instructions to continue deliberating. (Id.) On August 13, 1989, Moore was moved out of the cell with Randolph because Moore had been in a fight

/////

> declared before Moore was placed back in the jail cell with Randolph after his first meeting with Oppliger and Chavez on August 17.
>
> Moore testified that he was asked only general, introductory questions at the initial meeting on August 17 but was asked more pointed, detailed questions at the second meeting on August 24. Finally, Moore specifically described two different rooms in which each of the meetings occurred. According to Moore, the first meeting took place in an empty courtroom, and the second took place in a large conference room with a large table.
>
> Chavez and Oppliger each testified that only one meeting occurred, but they described differently the room in which this meeting took place. Chavez testified that the meeting was in an empty courtroom. Oppliger testified that it was in a jury room with a large table. These two rooms, as described by Chavez and Oppliger, appear to correspond to the rooms Moore described in which his two meetings took place. Moreover, Oppliger did not have any independent recollection of whether there were one or two meetings; he relied solely on a report written by Chavez to conclude that only one meeting took place.

Id. at 1145-46. The court made clear, however, that it set forth the facts not "to usurp the factfinding role of the district court . . . [but] to make clear the necessity for such factfinding." Id. at 1146.

[4] As noted above, in order to prevail on his Massiah claim petitioner must show that Moore was acting as an "agent of the State" when he obtained the incriminating statements from Randolph. Id. at 1144. Thus, if Moore obtained the incriminating statements before he ever met with Oppliger and Chavez the court need not determine what Moore did or did not do to obtain those statements. See Randolph, at 1146-47 (discussing Brooks v. Kincheloe, 848 F.2d 940 (9th Cir. 1988).

[5] Jury selection commenced for petitioner's trial on June 12, 1989. (Third Amended Petition, filed May 14, 1998, at 18.)

6

with another inmate. (Petitioner's Ex. 42, at 5.) On August 15, 1989, petitioner's first trial ended in a mistrial when the jury was unable to reach a verdict. (Petitioner's Ex. 27.)

On August 17, 1989, Moore appeared in the Fresno Superior Court for a trial confirmation hearing on the criminal charges pending against him. (Petitioner's Ex. 1.) That morning Moore gave his public defender a letter which he hoped would lead to a reduced sentence for him. (Excerpt of Trial Transcript, filed October 14, 1997, Testimony of Ronald Moore (hereafter Moore Testimony), at 672.) In the letter, Moore stated, inter alia, that he did not want to end up like his cellmate, Willis Randolph. (Id.) Moore's public defender advised the court that the letter created a conflict of interest for the public defender's office. (Petitioner's Ex. 1.) The court appointed conflict defense counsel and continued the trial confirmation hearing to August 24, 1989. (Id.)

On August 20, 1989, Moore was moved back into the cell with petitioner. On August 24, 1989, he went back to court for the trial confirmation hearing. (Id.) At that hearing, Moore was represented by his conflict attorney, David Nielsen. (Id.)

On August 24, 1989, Moore met with Deputy District Attorney Oppliger and Detective Pete Chavez after the trial confirmation hearing. (Petitioner's Ex. 10, Fresno County District Attorney Bureau of Investigations Investigation Report.) Moore's attorney, David Nielsen, was also present at the meeting. (Id.) At that meeting, Moore told Oppliger and Chavez that petitioner had told Moore "on two or three separate occasions" that he had committed the murder. (Id. at 3.) Moore said petitioner had talked about a man who had hired petitioner to do the killing, a man who "had come into court with a suit and talked and acted all sophisticated." (Id. at 2.) Moore said petitioner had told him he had gotten rid of the gun used in the murder by tossing it in a pond, and that petitioner had described the location of the pond. (Id.) From the description of the pond, Moore thought it might be on property that belonged to Moore's uncle. (Id.) Moore told Oppliger and Chavez that if it was he could show them the location of the pond. (Id.)

7

On August 29, 1989, Moore met again with Chavez and with Detective Fernando Reyna. (Petitioner's Exs. 4, 11.) The purpose of that meeting was so Moore could show Chavez and Reyna the pond described by Moore in the August 24, 1989 interview. (Id.) On the same day, Chavez and Reyna conducted a tape recorded interview with Moore. (Id.)

During the August 29, 1989 interview, Moore told Chavez and Reyna that petitioner's first statements to Moore that petitioner had committed the murder were made "probably the 2nd week of August" or "around about the middle of August." (Petitioner's Ex. 4, at 4.) Moore also told Chavez and Reyna that he did not start any of the conversations with petitioner about petitioner's case "unless it was what happened in court," (id. at 14), and that he was just listening to petitioner when petitioner told him he had committed the crime. (Id. at 3.) In response to an inquiry from Chavez about whether petitioner would have told Moore more details if he had asked, Moore replied "I think if I would of asked I don't think he would of [sic] told me nothing. Because I would seem to [sic] concern [sic] about what was going and he would of [sic] felt why is he asking he thought the everybody wanted to you know snitch on him about something." (Id. at 17; see also Petitioner's Ex. 4 at 3.)

On September 6, 1989, Moore was transferred to the Madera County Jail for security reasons after Fresno jail officials were advised by D.A. Investigator Frank Martinez that Moore was going to testify against petitioner. (Petitioner's Ex. 42.)

On November 6, 1989, Moore gave a taped interview to Don Brown of the Fresno Public Defender's Office. (Petitioner's Ex. 5.) Fresno District Attorney's Office Investigator Frank Martinez was also present during that interview. (Id.) Near the start of that interview, the following exchange took place concerning the letter petitioner had given to his public defender on August 17, 1989:

> RM: Well, actually I had wrote a letter to the D.A., and I was in a room with Willis Randolph, and you know how –
> 
> . . . .

8

| | | |
|---|---|---|
| 1 | RM: | And, you know, we was discussing how his crime from the youngest age, you know, got worse and worse and worse. And so I was writing a letter, and I was, you know, telling him about that, and I asked him if I could use what he told me in my letter. And so – |
| 2 | | |
| 3 | | |
| 4 | | . . . . |
| 5 | RM: | . . . . Well, I wrote it in a cell, and I took it to court. |
| 6 | DB: | Alright. |
| 7 | RM: | And I gave it to my public defender. |
| 8 | | . . . . |
| 9 | RM: | Jim Lamb. But he wasn't in that day so another guy, a Mexican guy, took his place. And so he wanted to look over the letter before I gave it – before he gave it to the D.A. And I get – what he told me – he came back in – he told me he wanted to show a supervisor. And he came back and told me that the Public Defender's Office couldn't take my case no more because the letter had something in it about a client of their's. [sic] |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | DB: | Meaning – Willis? |
| 14 | RM: | Meaning Willis Randolph. |
| 15 | DB: | I see. |
| 16 | RM: | And so he gave me the letter back, and I asked him – I said, you know, what do this mean? And he said I really can't talk about it. But, you know, whenever – whatever that this guy told you or whatever and because of this letter, you know, is a conflict. |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | DB: | The Public Defenders couldn't represent you any longer? |
| 21 | RM: | Yes. And so I asked him – I said – well, no he asked me – he said that this guy will tell you anything, and I said why, and he said, well, I'm just, you know, I'm just asking. And I said what if he did, and he told me – he said, well, you know, that's something you – whatever, you know – whatever – no, he asked me did the D.A. – did the District Attorney Office approach me while I was in – while I was in the cell with Willis, and I said no. |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | ///// | |

9

(Id. at 3-4.) During that interview, Moore told Brown that he had "three conversations" with District Attorney Oppliger. (Id. at 7.) Moore said that the first conversation took place while Moore was getting ready to go to court, and Oppliger and Chavez were present. (Id.) Moore told Brown that during the third conversation, Oppliger promised Moore he wouldn't go to prison on the charges he was then facing. (Id. at 8.) In addition, the following exchange took place between Moore and Brown:

> RM   And then so, you know, one day he started, you know, just – well, after – after his trial was a hung jury, you know, I was in – I was in four. They had moved me to another cell because of a fight, and then they had brought me back, and I was in the cell. They brought me back to the same cell as Willis. And, so then, you know, he started talking to me and talking to me and talking to me.
>
> DB   This was after his trial was a hung jury?
>
> RM   Yeah. And at the time, at the time I didn't know – actually, I didn't know – I thought he, you know, didn't act – didn't do what he was accused of doing. And til he started talking to me, I'm going to say that. And then – so after that, then I just start thinking and thinking and thinking and – but to answer the question, actually –
>
> DB   Go ahead.
>
> RM   As far as something being in it for me, I got something out of it but even if I wouldn't have got something out of it, I would have did it anyway.

(Id. at 4.)

On November 17, 1989, Moore testified at petitioner's second trial. Moore testified that petitioner had told him that he had committed the murder, and that petitioner had told him that "[c]lose to the ending" of petitioner's first trial. (Moore Trial Testimony, at 722, 729.) Moore's testimony at trial concerning when and what petitioner told him about the crime was consistent with the statements made during Moore's August 24, 1989 interview with Chavez and Oppliger. (Compare Petitioner's Ex. 10, passim, with Moore Trial Testimony, passim.)

/////

During his testimony at petitioner's second trial, Moore testified to the circumstances surrounding the presentation of the letter to his public defender and to his conversations with Oppliger and Chavez, as follows:

Q   As you were approaching the trial confirmation did you have occasion to write a letter of some sort?

A   Yes, I did.

Q   And what was the purpose of that letter?

A   So I could get my time cut shorter.

Q   What exactly was – what were you trying to do? Who were you trying to reach?

A   You mean who I wrote the letter to?

Q   Yes.

A   The D.A.

Q   D.A. that was handling your auto theft case?

A   Yes.

Q   And in – just a yes or no answer. In that letter did you mention Willis Randolph?

A   Yes.

Q   And in the letter was – were you basically trying to indicate that you're getting deeper and deeper in trouble and you wanted to change your life?

A   Yes.

Q   And that you didn't want to be like Mr. Randolph?

A   Yes.

Q   When you showed that letter to your lawyer, did that cause a problem of some sort?

A   Yes.

Q   Did it cause him to conflict out of the case and have you have a new lawyer appointed?

11

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did that new lawyer talk to you about any information you might have had with respect to Mr. Randolph? |
| 3 | | |
| 4 | A | Yes. |
| 5 | Q | And was there ultimately a decision by you and your lawyer to talk to the District Attorney handling the Willis Randolph matter? |
| 6 | | |
| 7 | A | Yes. |
| 8 | Q | And at some point in time did myself and Detective Pete Chavez come over to see you as you were in a trial confirmation? |
| 9 | | |
| 10 | A | Yes. |
| 11 | Q | And at that point in time were you prepared to talk to us? |
| 12 | A | Yeah. |
| 13 | Q | What, if any, promises were made to you on that first occasion? |
| 14 | A | None. |
| 15 | Q | What was – what were you told? |
| 16 | A | Umm. |
| 17 | Q | Your understanding of it. Obviously, that's the way I should have put it. |
| 18 | | |
| 19 | | What was your understanding of that first conversation that was – you were supposed to have with the Detective Chavez? |
| 20 | | |
| 21 | A | He asked me just to tell him what I know. |
| 22 | Q | At some point in time after that – and you did – strike that. |
| 23 | | You did tell Detective Chavez what you knew? |
| 24 | A | Yes, I did. |
| 25 | Q | At some point in time after that did Detective Chavez have a second interview with you? |
| 26 | A | Yes, he did. |

12

| | |
|---|---|
| 1 | Q   And did he tape record that second interview? |
| 2 | A   Yes, he did. |

(Moore Trial Testimony, at 672-74.)

On June 25, 1997, Moore dictated a declaration in which he stated, inter alia, that up to the time of Moore's first meeting with Oppliger petitioner "had denied his guilt" to Moore, and that the purpose of Moore's letter was not to offer to cooperate against petitioner but to "seek leniency because [he] was trying to change [his] life." (Petitioner's Ex. 7, at 4.)  He further averred that "as a result of this meeting [he] knew [he] would be cooperating with Oppliger against Randolph for leniency." (Id.)  In the next paragraph, Moore averred that he "returned to the jail in [his] cell with Willis Randolph. . . ." (Id. at 5.)  In the same declaration, Moore averred that

> I testified that Willis told me he did it (the killing), but this was false.  He never said that.  I lied because Oppliger and Chavez kept asking me "did Randolph tell you he did it?"  I wanted to help myself, and I knew they wanted to hear that.  I am not proud of this; it has bothered me all these years.

(Id. at 7-8.)

At the November 2000 evidentiary hearing, Moore testified that his first meeting with Oppliger and Chavez took place on August 17, 1989. (Transcript of Evidentiary Hearing, November 13, 2000, at 1-61.)  Moore testified that the first meeting took place in an empty courtroom, (id. at 1-49, 1-52), and that Oppliger, Chavez, and Martinez were present at the meeting but his attorney was not. (Id. at 1-52, 1-54.)  Moore also testified that following this first meeting he was returned to the cell that he shared with petitioner. (Id. at 1-61.)  Moore gave the same testimony at his 1999 deposition. (Petitioner's Ex. 3, Deposition of Ronnie Dwayne Moore, May 27, 1999, at 18-23.)

At the November 2000 evidentiary hearing, District Attorney James Oppliger testified that the first meeting with Moore took place on August 24, 1989. (Transcript of November 2000 Evidentiary Hearing, at 3-21, 3-22.)  Oppliger testified that the meeting took

place in a jury room.  (Id. at 3-22, 3-24.)  Investigator Pete Chavez testified that the first meeting with Moore took place on August 24, 1989, (id. at 3-106, 3-108), and that the first meeting took place in a jury room.  (Id. at 3-98.)

In order to prevail on his Massiah claim, petitioner must show by a preponderance of the evidence that he obtained incriminating evidence from petitioner while acting as an agent of the state and while Moore was making some effort to stimulate the incriminating conversations with petitioner.  To make this showing, petitioner relies in large part on Moore's testimony that the first meeting he had with Oppliger and Chavez was on August 17, 1989, the day he presented the letter to his public defender, and on Moore's testimony that petitioner's incriminating statements were made to Moore after that first meeting.

The only evidence that the first meeting between state agents and Moore took place on August 17, 1989 comes from statements made by Moore starting almost eight years after the events at bar, and from some circumstantial evidence, noted above, of disparities in descriptions of where that first meeting took place.[6]  On the record before this court, Moore's June 25, 1997 declaration is the first time Moore stated that his first meeting with Oppliger and Chavez occurred on the day he gave the letter to his public defender.  (See Petitioner's Ex. 7.) Both Oppliger and Chavez testified that the first meeting with Moore took place on August 24, 1989, and neither Chavez' August 24, 1989 investigation report, nor the transcript of the August 29, 1989 taped interview of Moore, nor Moore's testimony at petitioner's second trial contain any suggestion that Oppliger or Chavez met with Moore prior to August 24, 1989.  Moore's November 6, 1989 interview with Don Brown refers to three meetings with Oppliger but there is no clarity in that transcript about the date of the first meeting.  (See Petitioner's Ex.5.)

---

[6] There are also perplexing questions about why Moore was returned to a cell with Randolph after he met with Oppliger and Chavez on August 24, 1989 if, as it appears from the record, Moore had received unsolicited incriminating statements from petitioner and had relayed that information to the prosecution.  However, those questions, without more, do not establish a Massiah violation.

Moore also testified at his 1999 deposition that the first meeting with Oppliger, Chavez and a third person took place on the day he presented the letter to his public defender and prior to the appointment of his conflict attorney. (Moore Deposition, at 18.) His testimony at the first evidentiary hearing in this action in November 2000 was similar. (November 2000 Evidentiary Hearing, at 1-44, 1-52.) It is undisputed that Moore gave the letter to his public defender on August 17, 1989, and that conflict counsel was appointed for Moore on the same day. However, Moore also testified at his deposition and at the November 2000 evidentiary hearing that after this interview he went back to his cell and that petitioner was in the cell with him. (Moore Deposition at 23; November 2000 Evidentiary Hearing Transcript, at 1-61, 1-62.))

The record now establishes conclusively that Moore and Randolph did not share a cell from August 13, 1989 until August 20, 1989. Thus, it can either be true that Moore met with Oppliger and Chavez for the first time on August 17, 1989, **or** that Moore went back to the cell he shared with Randolph after this first meeting; it cannot be true that the first meeting took place on August 17, 1989 **and** that Moore went back to a cell he shared with Randolph right after that meeting. If, however, Moore's first meeting with Oppliger and Chavez was August 24, 1989, it would be true that he went back to a cell he shared with Randolph right after that meeting.

In addition, Moore testified at his deposition and at petitioner's second trial that his second meeting with state agents was tape recorded. (Moore Deposition at 127; Moore Trial Testimony at 674.)[7] The first tape recorded meeting Moore had with state agents connected to petitioner's case was on August 29, 1989. This testimony, then, also suggests that the first meeting between Moore and state agents was on August 24, 1989.

/////

---

[7] Moore also responded affirmatively when he was asked whether Oppliger was present at the tape recorded interview. (Moore Deposition, at 127.) The tape recorded interview on August 29, 1989 was conducted by Detective Fernando Reyna and Investigator Pete Chavez. (Petitioner's Ex. 4.) In his 1999 deposition, Oppliger testified that he was not present during that interview. (Petitioner's Ex. 12, Deposition of James Oppliger, at 85-86.)

15

Moore's testimony concerning when petitioner made statements to Moore has been contradictory and equivocal since he first started cooperating with investigators.[8] Detective Chavez' August 24, 1989 investigation report indicates that Moore told Chavez and Oppliger on that day that petitioner had told Moore "on two or three separate occasions" that he had committed the murder. (Petitioner's Ex. 10, at 3.) The transcript of Moore's August 29, 1989 taped interview with Chavez contains similar statements. (Petitioner's Ex. 5.) In his 1999 deposition, Moore testified that he didn't remember telling Chavez on August 24, 1989 that petitioner had told Moore he had committed the murder and the statement in Chavez's report that he had was not accurate. (Moore Deposition, at 26.)

In his November 6, 1989 interview with Frank Martinez and with Don Brown of the Fresno Public Defender's Office, Moore declined initially to answer questions about when he began to believe petitioner was guilty of the murder, although he did say that petitioner began to "act differently" around the time jury selection started in petitioner's first trial. (Petitioner's Ex. 5.) During the November 6, 1989 interview, Moore suggested that petitioner's incriminating statements had been made to Moore after petitioner's first trial ended in a mistrial and after Moore returned to the cell on August 20, 1989. (Id. at 4.) The description given by Moore during that interview of his August 17, 1989 conversation with his public defender concerning the conflict created by Moore's letter, however, gives rise to an inference that the letter contained some incriminating information concerning Randolph. (See Petitioner's Ex. 5, at 3.)[9] In

---

[8] Moore's testimony about whether petitioner actually told Moore he committed the murder has also been inconsistent over the course of petitioner's post-conviction proceedings. In his 1997 declaration, Moore averred that he testified that petitioner had committed the murder, but that this testimony "was false." (Petitioner's Ex. 7, at ¶ 17.) Petitioner's claim that his due process rights were violated by knowing introduction of perjured testimony from Moore has already been denied.

[9] At the March 2006 evidentiary hearing, petitioner called a former informant, Leslie White, to testify concerning a number of matters, including the manner in which Moore might have been coached by prosecution officials to obtain incriminating information from petitioner. Mr. White's testimony has served more as an aid to assessment of Moore's credibility than in establishing a Massiah violation. White testified that Moore's August 17, 1989 letter "was

addition, Moore was clear in that interview that he had approached the district attorney initially and that in their first meeting Moore "just told him about – about what information that I had leading to that certain case of Willis Randolph." (Id. at 6.)[10] If Moore had information about petitioner's case to give to the district attorney at Moore's first meeting with the district attorney, and if Moore got that information after he returned to the cell with petitioner, then the first meeting between Moore and the district attorney would have had to occur on August 24, 1989.

In contrast, but making no difference in the ultimate resolution of the claim at bar, the statements made by Moore on August 29, 1989, see page 8, supra, suggest that petitioner had made incriminating statements to Moore before Moore moved out of the cell on August 13, 1989, and before Moore had any meeting with state agents. As noted above, petitioner's first trial ended on August 15, 1989. The record now establishes that on August 13, 1989, Moore was removed from the cell that he shared with petitioner and that he was not celled with petitioner again until August 20, 1989. If, as Moore suggested on August 29, 1989, petitioner made incriminating statements to Moore while petitioner's first trial was ongoing, (see, e.g., Petitioner's Ex. 4 at 4), such statements would have had to have been made to Moore on or before August 13, 1989.[11]

/////

---

apparently interpreted by other people to be much more than [a generic letter], and I say that based on the reaction Mr. Moore got from the letter. But I've seen nothing in the record to indicate that Mr. Oppliger initiated the contact, as opposed to somebody talking to him and saying, hey, this guy has information, or the letter containing much more than we've all been told." (Transcript of March 30, 2006 Evidentiary Hearing, at 193.) The letter is not part of the record.

[10] During that interview, Moore also said that no promises were made to him at the first meeting, and that he told the D.A. "I said, you know, I don't want nothing. It's nothing that I want. It's just that that could have been my son that, you know, this happened to, or you know, anybody – or one of my relatives." (Id. at 7.) Moore gave similar testimony at petitioner's second trial. (Moore Trial Testimony, at 753.)

[11] As noted above, in his June 1997 declaration, Moore averred that his testimony that petitioner had confessed the crime to him was false. (Petitioner's Ex. 7, at ¶ 17.) The veracity of that statement is not before the court.

In order to prevail on his Massiah claim petitioner must show by a preponderance of evidence that Moore did not obtain the incriminating statements from petitioner until after his first meeting with prosecution officials. See Randolph, at 1144. After careful review of the record, for the foregoing reasons, this court finds that petitioner has failed to meet this burden. As described above, the great weight of the evidence is that Moore obtained the incriminating statements from petitioner prior to his first meeting with Oppliger and Chavez, and this court so finds.[12] Given this finding, the court need not address the second question posed by the court of appeals concerning what, if anything, Moore did to stimulate conversation with Randolph to obtain the incriminating information.[13]

There was no violation of petitioner's Sixth Amendment right to counsel in connection with the statements attributed to petitioner by Moore. Accordingly, petitioner's sixth claim for relief should be denied.

B. Petitioner's Brady Claim as to Ronnie Moore

In his tenth claim for relief, petitioner contends that his due process rights were violated by the concealment of facts showing the alleged Massiah violation with respect to Moore's cooperation with the prosecutor. As noted above, the court of appeals declined to resolve this claim. The court of appeals described this claim as follows:

> Randolph challenges the prosecution's failure to turn over details of the State's dealings with Moore and Konkle. Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), prosecutors have a duty to disclose exculpatory material on their own, without a request by the defendant. *Brady* material

---

[12] Petitioner's witness, Leslie White, opined at the conclusion of his testimony that "[b]ased on the totality of the circumstances and the information Moore has repeatedly stated, the one thing he's been certain about was that [Moore elicited the incriminating information] after the hung jury and after the first conversation with police." (Transcript of March 30, 2006 Evidentiary Hearing, at 215.) For the reasons set forth supra, this characterization of Moore's certainty about the timing is not supported by the great weight of the evidence before this court.

[13] Review of the record shows that Moore's statements in this regard are as inconsistent as his statements concerning when, and indeed whether, petitioner made incriminating statements to him.

includes evidence that would help to impeach a prosecution witness. See United States v. Brumel-Alvarez, 991 F.2d 1452, 1461 (9th Cir.1992). However, a defendant must also show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 668, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

We are unable to assess the strength of Randolph's *Brady* claim with respect to Moore. Randolph rested his *Brady* claim on the argument that the prosecution failed to turn over information that might have allowed him to pursue suppression of relevant evidence under Massiah. Randolph did not argue that information about any meeting between Moore and state officials while he and Moore shared a cell would have provided general impeachment evidence. Therefore, Randolph has a viable *Brady* claim only if the district court finds that Moore and state officials met before Randolph made incriminating statements to Moore.

As described above, we do not know when the first meeting between Moore and the prosecution team took place.

Because we do not know the date of that first meeting, we do not know what happened between Moore and Randolph after that meeting. Because we do not know these things, we are unable to determine whether there was a *Brady* violation.

Id.

For the reasons set forth in section IIA, supra, this court finds that petitioner's incriminating statements to Moore preceded Moore's initial meeting with state officials. Accordingly, there was no Brady violation in connection with Moore's cooperation with prosecution officials. This claim for relief should be denied.

In accordance with the above, IT IS HEREBY ORDERED that:

1. The Clerk of the Court is directed to transfer the file in this action back to the Fresno Division of this court;

2. Any and all documents filed in this action subsequent to issuance of these findings and recommendations shall be filed in the Fresno Division of this court before the United States District Judge assigned to this action; and

/////

IT IS HEREBY RECOMMENDED that the two claims remaining in petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 27, 2008.

UNITED STATES MAGISTRATE JUDGE

12
rand5604.157r